We're going to begin Good morning and welcome all to our Richard H. Chambers Courthouse here in Pasadena. It's a pleasure to be here. This is the time set for the case of International Longshore and Warehouse Union and International Longshore and Warehouse Union Local 19 versus the National Labor Relations Board, International Association of Machinists and Aerospace Workers District 160 Local Lodge 289. Parties are ready to proceed. You may come forward. Good morning, Your Honor. I may please report. I'm Kathleen Foley here on behalf of the International Longshore and Warehouse Union petitioners. ILWU and Pacific Maritime Association will each be taking 15 minutes and I'll try to reserve three minutes for rebuttal. We'll do the best you can on that. I will. Thank you. There are two board orders under review here and the board erred with respect to both of them. The 10k order represents an inadequately explained departure from precedent in two respects and it's also unsupported by substantial evidence. The ensuing 8b4d order which was premised on the 10k order is erroneous for its failure to recognize per Kinder Morgan that ILWU and PMA's automation work preservation agreement could constitute a complete defense to the underlying 8b4d charge. Now I'd like to discuss both of the and the 8b4d charge. Kinder Morgan is a narrow correct decision. It recognized that when a union that's party to an 8b4d proceeding asserts a work preservation defense based on an automation work preservation agreement, the preservation or acquisition inquiry that's at the heart of the work preservation doctrine has to be broad and if the result of that inquiry is that the union is attempting to preserve work, an 8b4d charge will not lie. I welcome the court's questions. What if both unions have an automation work preservation agreement? So under Kinder Morgan, the board would still be divested of the ability to resolve the dispute between the unions and that I don't have the site in front of me but the board has noted at least in the context of Safeway that the fact that both unions are making work preservation defenses doesn't mean that it's any less of a work preservation dispute. But with respect to 10k, if both unions had automation work preservation agreements and were asserting the defense, then I think the board would have to examine both of the agreements and consider whether one of them is perhaps broader in scope. One of them might be a multi-employer coast-wide agreement and the other might not and in that circumstance it would consider, I think it would give more weight to the one that was broader in scope. But those facts aren't before, weren't before the board here and those weren't the facts of Kinder Morgan. Aside from Kinder Morgan, what's your best case for the proposition that the ILA work preservation defense applies to section 8b4d changes? I think that follows, I think that follows directly from the reasoning of the ILA cases themselves. There the Supreme Court was discussing the work preservation doctrine and the preservation or acquisition inquiry that's at the heart of the work preservation doctrine. But they weren't discussing 8b4d and to go to Judge Smith's question, no other circuits ever applied it this way, right? Just Kinder Morgan. I think you alighted the question. I just want to make sure he gets an answer. Sure, Judge Kristen, thank you. I believe that's correct that Kinder Morgan is the only case to consider the circumstance and rule in this way. But I still think that the rationale of the ILA cases maps directly on to 8b4d. Well, can I ask you, I don't understand how you get to the, I mean of course you've read the briefs probably many, many times and it seems the obvious conclusion is to the contrary. That if it's allowed to be used this way then the 10k enforcement mechanism is eviscerated. So could you speak to that? That's my problem. Sure, so the first of all I think it's important to note that automation work preservation agreements, while incredibly important to the longshore industry, are very rare writ large. And Kinder Morgan itself is really premised on and directed to the presence of an automation work preservation agreement and it's very narrowly scoped. So before you go farther right there, Judge Koh I think asked, and I had the same question, both of these unions had similar automation agreements provisions, don't they? No, I disagree with that respectfully. Well, when you circle back maybe you could distinguish them for me because it seems to me they both have them. Sure, so I'm happy to distinguish them now because IAM typically doesn't get the benefit of the ILA doctrine because its contract is not an automation work preservation agreement. And that's for two primary reasons. First, its contract is not tailored to preserve work. At footnote 24 of ILA 1 the Supreme Court noted that it's important for purposes of determining whether the ILA doctrine applies, quote, how closely the parties have tailored their agreement to the objective of preserving the essence of traditional work patterns. Now IAM's contract isn't tailored. It doesn't address either the displacement of workers or the preservation of traditional work patterns. What is the relevance of this point to the arguments here in terms of does it go to the B4D issue or does it go to the 10-K issue or both? It goes to both of those issues. How as to each? So with respect to the 10-K our position is that the PCLCD should have been given substantial weight in the context of the 10-K analysis just as the board has given substantial weight to predecessors to the PCLCD before and neither did so here nor explained why it wasn't doing so. In the context of AB4D I guess the distinction isn't as important as it is with respect to 10-K because ultimately whether there was one automation work preservation agreement or two the board would in any event be divested of the jurisdiction to go ahead and resolve the dispute. What was wrong about the DC circuit's reasoning in C-Land? Sure. So a couple of points on that. First I want to reiterate as we noted in our brief that the DC circuit didn't address an automation work preservation agreement and indeed the parties' collective bargaining agreements were not before either the board or the DC circuit there. And I have a few... So you think the facts are just inapposite? I think that the DC circuit did not have occasion to consider the question that was before this court in Kinder Morgan. But I also think it's important to note that the DC circuit itself hasn't read C-Land to absolutely preclude application of the ILA doctrine in the context of AB4D. In ILWU Local 14 versus NLRB which was an AB4D case decided seven years after C-Land, the DC circuit distinguished the ILA cases as involving collective bargaining agreements whereas the case before it did not, not on the basis of involving AB4B versus AB4D. And the citation on that is 85F third at 654 note four. So assuming Kinder Morgan doesn't apply, what is the relief that you're looking for here? So we're asking that the court vacate the board's decisions just like the panel did. Vacate and remand or just vacate? The panel vacated and remanded for further proceedings consistent with the panel's opinion. What would the remand, what would be left? If we vacated and remanded, what would be left there for the remand? I think on remand, the board would apply the ILA doctrine. If this court were to uphold Kinder Morgan, the board would apply the ILA analysis and consider the party's collective bargaining agreement, the PCLCD, and how it attempts to accommodate automation, excuse me, how it attempts to accommodate worker displacement in the face of automation. And if it found that the PCLCD was an automation work preservation agreement within the definition of the ILA cases, then it would dismiss the AB4D charge and that would be the result. So you're challenging the board's underlying decision? Are you saying there wasn't substantial evidence to support it? Yes. So with respect to the 10K order, we're challenging that order as well. And so if the court didn't agree with us with respect to Kinder Morgan, we still think that both of the orders under review should be vacated because the 10K order serves as the foundation for the AB4D order. And this court has said that if the 10K order falls, the AB4D order falls along with it. Now there are two main issues with the 10K order. One of them concerns the automation work preservation agreement, and one of them is independent of it. So taking the first of those, the board failed to take it either follow or explain why it wasn't following a series of cases in which it gave substantial weight to a predecessor to the PCLCD in the 10K analysis. Can we go back to ILA? That was determining the difference between permissible primary activity and permissible secondary activity. What's the secondary activity here? You have two unions that have agreements with the same employer. Where's the pressure on some third party? So the primary versus secondary inquiry is essentially an iteration of the preservation or acquisition inquiry. And that's what animates the... Well, they're both called preservation work defense, but they're actually different, right? They're serving different purposes. The sort of Safeway line and then the National Woodward ILA line. I wouldn't agree that they're serving different purposes. They're deployed in different contexts, but ultimately... One is B and one is D. So why should we import B into D when they're serving the same function and they're in different economic situations where you're trying to coerce a third party, where you're having direct pressure on the employer? Because the underlying question is the same. The result of the preservation or acquisition inquiry in 8B4B, as you point out, is whether it's primary or secondary. So ultimately, the court is asking whether the union is attempting to preserve work. And if it's attempting to preserve work that it already has or to which it already has a right, then it's not... I agree that ILA is the only case that both Kinder Morgan cites and that you're relying on, and that's a B case. And Kinder Morgan requires that importation into B. I'm not sure I understand your question. I mean, I agree that we're relying on ILA and that no other... I'm not aware of any other... The court has imported ILA into the D context. I agree with that, yes. But I still think that this court was correct to do so, for the reasons set forth in our briefs. How about the question Judge Kristen had earlier about, under your interpretation, is the 10K process then essentially meaningless or eviscerated? No, it's not meaningless or eviscerated. So because these agreements are rare, in the mine run of jurisdictional disputes, the board is going to be able to go ahead and do what it ordinarily does. And if this court were to disagree with us on Kinder Morgan, then at an absolute minimum, these agreements should have a substantial place in the 10K analysis. Well, but wait, but I don't understand. I think your argument about why this application wouldn't eviscerate the enforcement mechanism is just that it wouldn't happen very often, because you're talking about the mine run of cases. But there are cases like this one, where the board entered a 10K order. And so I think Judge Gress and I are both trying to get you to tell us, what would the board's enforcement mechanism be? What would they have left if a party could do what happened here? In these circumstances, a board remedy would not be available. But that's the case in Safeway cases as well. And the board, in its supplemental briefing, worried about- What's the point of a 10K then? Why would they have a 10K? You can't enforce it. Well, so I think our position is that they shouldn't have had... We didn't assert Kinder Morgan or a work preservation defense at the 10K. So in the circumstances here, it was appropriate to have a 10K. And then when we asserted the work preservation defense at the AP4D, the charges should have been dismissed. So in similar factual circumstances, then a 10K, even with respect to automation work preservation agreements, is entirely appropriate. But if the court disagrees with us about Kinder Morgan, then our position is that these agreements, that 10Ks could certainly proceed, but that these agreements should be afforded substantial weight in the 10K analysis. And again, the board did not explain in its underlying decision why it didn't do that. And it obviously didn't do that here. So ILWU sought arbitration here and outside board remedies. Why isn't that contrary to what the Supreme Court says, which is in these types of jurisdictional disputes, you let the board decide? So ILWU availed itself of its contractual remedies for SSATs violation of the automation work preservation agreement. Right. So how do you reconcile that with the Supreme Court saying the board should decide these jurisdictional disputes? I mean, I think that ILWU did what was available to it under its contract. And it didn't see itself as directly challenging the 10K because it wasn't seeking, it was ultimately seeking a determination that SSAT had violated the contract. And it was not challenging the fact that SSAT had reassigned the work in accordance with the 10K. It was challenging SSATs violation of the underlying contractual agreement. Oh, forgive me. No, please go ahead. I was going to turn back to your argument that the 10K wasn't supported by substantial evidence. And I guess my first question is that you do agree that that's the correct standard. I agree that that's the standard with respect to the fact that the board went ahead and inferred a preference. We think that it was a mistake to infer a preference in the first instance and that that was an arbitrary and capricious decision because... Okay. I appreciate that your position is that the board did that and that's contrary to its prior proceedings and in some other cases, but I read the record differently. And I'm wondering why it would be incorrect to decide that what the board did is acknowledge that prior precedent and distinguish it by recognizing that initially Denaiki said he didn't want to say the preference, but then he went on to do so. He was really being more diplomatic than he was actually not stating a preference. Well, it's not enough to just acknowledge that there is contrary precedent and say anything. The distinction that the agency makes has to be reasonable. And there's just no support in board law for the sort of semantic lacework in which the board engaged here. It assigned enormous weight to Denaiki's use of give versus have in its order, but especially in light of the significance of employer preference in the board's 10K analysis, it just doesn't make sense to parse employer language so closely. And doing so is simply not supported by the board law. But he said, all is being equal. If we didn't have contractual obligations, we'd go with IAM. He explained why they were well-trained, more efficient, more cost-effective to work with that union. Why isn't that sufficient given those very permissible standards of review? I disagree with that view of the record. Looking at that exchange, Denaiki was asked what he would have done without contractual obligations. But it's clear in context that what was being asked was without the contractual obligation that he was under with respect to the PCLCD. And that's what the board said in saying what he would have done absent any contractual obligations. Specifically in the board's order, it says without the PCLCD obligation. And that's just not a rational point. Why does that distinction help me? Right there, I'm missing your point. Why does that distinction help me? Because it's not as if he's saying what he would have done were he not under any contractual compulsion whatsoever. It's saying what he would have done if instead of being under two conflicting contractual obligations, he was only under one. And as SSAT itself says in its brief, in that circumstance, it makes all the sense in the world for it to prefer the union to which it has a contractual obligation. But what's more meaningful is to look at what SSAT actually did when it was under two competing contractual obligations, which was to assign the work to ILWU and to refuse to change its mind even in the face of IAM threats. But the record can be read to suggest that what they thought they really had to go with that union. And then there's the board side is quite a bit. The record shows us quite a bit of a number of reasons that seem to be objectively quite reasonable for preferring IAM. I'm sure you know the record very well. You clearly do. The number of hours that were worked, why it would cost more money, why there was a separate shop hiring call that had to be paid, why they'd have to buy additional tools. It's quite a long list. And what's your best shot to convince me that that's not sufficient? I think those things cut in favor of ILWU properly viewed because the fact that SSAT assigned the work to ILWU, even despite those other factors that, at least in the board's opinion, made IAM the more economical, the better trained, the better choice, that shows, if anything, that SSAT in fact preferred ILWU because that was what it actually did, was assign the work to ILWU. Thank you very much. Thank you. Thank you. Good morning, your honors. May it please the court. My name is Michael Keneally, and I represent the Pacific Maritime Association. I'll try to reserve three minutes for rebuttal as well. Work preservation agreements are a crucial tool for peacefully introducing new technologies into a unionized workplace. In the ILA cases, the Supreme Court examined the importance and proper scope of work preservation agreements in the same setting as this case, and it held that when new technologies fundamentally alter the way that longshore work is performed, work preservation agreements aren't restricted to preserving the historical way of performing that work. I agree with my friend that the court's decision in Kinder Morgan properly applies those principles. I'd simply add that employers have a strong and independent interest of their own in the efficacy of work preservation agreements. They do not merely preserve union jobs. They also promote employers' ability to introduce important new technologies to modernize and make business operations more efficient. In this case, the ILWU never should have had to raise a work preservation defense to an unfair labor practice charge because the board never should have issued the 10-K decision that it did. The employer in this case, our member, SSA, fulfilled its obligation under the PMA contract to assign this work to the ILWU, and the board should not have reassigned it to the Section 10-K award. Under the governing legal standards, that award should be vacated, and the defense question that rises under Kinder Morgan isn't even something the court needs to address. Judge Christin, you're right that the factual determinations of the board in the Section 10-K decision are reviewed for substantial evidence, but the board's reasoning is also reviewed under the familiar arbitrary and capricious standard of the APA. Here, the board committed a classic arbitrary and capricious problem. It refused to apply its existing precedent or to adequately distinguish it. Judge Christin, I think you— What precedent are you referring to? I'm referring to the precedent on inferring an employer preference when the employer has refused to provide one and has asked the board to assign the work without regard to one. The board cited the heritage display case in its decision in the 10-K proceeding, but the board never addressed the case that we cite in our briefs, Henkels and McCoy from 1994, which is, I'd submit, indistinguishable from the testimony that Mr. DeNike provided here. Just as in this case, the employer's representative in Henkels and McCoy said that he refused to provide a preference and asked the board to reward the work notwithstanding. The board said that this was a disclaimer and that this disclaimer was controlling in finding employer preference neutral. If the board— I question both your brief and ILWU's brief present a parade of horribles, that if Kinder Morgan is overruled, you won't be able to negotiate preservation agreements anymore. You won't be able to enforce them. But the work preservation agreement that's at issue here was bargained for after Sealand and before Kinder Morgan. So why couldn't you do that even if Kinder Morgan is overruled? Well, we certainly could try. I will just say that after the 10-K decision in this case, it became a lot harder to negotiate the work preservation agreement in the next round of PMA-ILWU negotiations. And Kinder Morgan provides security that as a backstop, if the 10-K— Then it seems like the result, Kinder Morgan actually made it harder because this agreement was bargained for in 2008. Kinder Morgan was 2020. So you're saying after Kinder Morgan became law, it was actually harder to negotiate a work preservation agreement? No, your honor. I was saying that after the 10-K decision in this case back in 2020, when the contract was up for renegotiation, it was harder to negotiate over this language, not because of anything in Kinder Morgan, but because of the board's refusal to adhere to the assigned— Before Kinder Morgan, when in 2020? What's the sequence in 2020 of these two events? The 10-K award came, I think, in the summer of 2020, and Kinder Morgan was decided by this in October of 2020. Okay. So then regardless of Kinder Morgan, then it sounds like the negotiation was harder. I read all your briefs and I hear all this concern, but I'm just not clear on whether that concern is warranted because you're saying these negotiation difficulties happened before even Kinder Morgan was issued. No, sorry, your honor. If I did, I misspoke. I was trying to say that after the 10-K decision in summer of 2020, the contract was renegotiated, I think, in 2023, and that is when it was more difficult to secure agreement over the work preservation agreement as a result of the board's 10-K decision. And I think if this court were to hold, as it held in the local number 50 case that we cite from this court in 1974, that the PCLCD, the PMA, collective bargaining agreement, is entitled to wait and the board has given it wait in the 10-K proceeding, that would alleviate a lot of these concerns because that would ensure that, unlike here, the board wouldn't say an assignment made by an employer to comply with the PCLCD is not probative of the employer's preference. If anything, it cuts the other way, which is what the board inferred here. This is another area in which the 10-K decision departed from a long line of board cases, and I would submit this court's local number 50 case, because in those cases, and in particular, I think the Howard Terminals case from 1964 is a good example, even where an employer had collective bargaining agreements with two separate unions, in that case, the board gave great weight to the automation concord in our agreement, called it a pioneering settlement and one that promotes industrial peace in this area of American industry, and the board applied the opposite approach here. If anything, it said that Mr. DeNike's conceded desire to comply with the PMA agreement was not at all relevant in inferring employer preference. If anything, the question about a counterfactual, if you didn't have any agreements, to whom would you assign the work, that took priority over the admitted desire of Mr. DeNike to comply with our agreement? And again, I've got a question. Could I ask this question about your position that the board's decision was arbitrary and capricious? I think your argument is that the board strayed from its precedent, and as I indicated, I think the board explained and distinguished its prior precedent. I'm looking at ER 53, and I would like to hear your response. The board there said it has not limited itself to considering the explicit preference or refusal to state one. It has relied on other evidence presented during a hearing to make a conclusion as to the employer's preference, which of course you know. So why is the board wrong about that? Is it your position that the board has been entirely consistent in the past in treating the employer's preference the way you suggest? I do think the board has been consistent, and I thank you for pointing out that passage, Your Honor. That's where the board is discussing the United Drilling case, and in that case, I think if anything, the board's approach would support ILWU here. In that case, the NLRB inferred a preference merely because the employer failed to state a preference. There's no indication from that decision that the employer refused to give a preference, which is what happened here. And the board inferred that preference based on the fact that the employer had originally assigned the work to one union, had refused to assign the work to the other union after the other union engaged in threatening activity, and the employer was dissatisfied with the threatening union's work. Here, two of those factors unambiguously cut in favor of the ILWU. There's no dispute that SSA originally assigned the work to ILWU. It did not reassign the work after the IAM engaged in threats, and there's testimony from Mr. DeNike, and this is 1316 in our excerpts of record, that he was very satisfied with the Terminal 5 ILWU mechanics. So I think that United Drilling example, which is the only case that the board cited on this point for its approach, cuts against the board's ruling. You're not answering my question respectfully, sir. You haven't answered my question, and you're asking us to find the board's decision is actually arbitrary and capricious. So my question is, I think to do that, you have to convince us that the board has not deviated, and that it's wrong when it says that it has not limited itself to considering the employer's explicit preferences or refusal to state one. So I think the board failed to distinguish the Henkels and McCoy case that I mentioned earlier. That's not cited in the board's decision at all. It's on all fours factually with our case, and the case that it cited for your honor's point about inferring a preference when the employer refused to provide one, as I just explained, the factors that the board used to infer a preference don't actually support inferring the preference that the board inferred here. So I'm still waiting for, I'm still listening, waiting for an answer to my question. Is it really your position that the board is wrong when it says it has not limited itself in this way? And if so, what's your best shot? What's your best case law authority for that? I do think that the board is wrong, and I think I don't have any affirmative authority other than the ones I've already cited, but the one that the board cited does not actually support the proposition for which the board cites it. Different. That's a different point. So, so what, what I'll just, I'll just ask it this one other way, because I haven't heard from your team an answer to this question. It seems to me that the board has recognized that the initial indication very clearly did not want to state a preference as to either one of these unions that had contractual obligations with both, and then, and then the board went on, but went on to say if I didn't have the obligation that we would have gone with IAM. And then the board looked behind that and cited quite a number of reasons why it was more efficient, more cost effective, they were going to save money in a number of ways if they went with IAM. Why isn't that sufficient for the board to inform that that would have been SSA's preference? Because, Your Honor, the efficiency and economy considerations that you just highlighted, which are admittedly supported by that testimony, are a separate prong of the work preservation analysis. And the board already concluded that those factors supported the IAM, and we're not taking issue with that. We're only taking issue with the preference point. And in addition to the testimony that Your Honor cited, the SSA post-hearing brief actually reiterates that this testimony was not meant to state or imply a preference, and that's 1426 of our excerpts of record. And I think that that's an important point that the board completely glossed over in inferring the preference that it did. Let's say, let's say that the employer preference and past practice factor two should have been neutral. That's what you're arguing, correct? Weren't there at least three factors that supported IAM and two factors that supported ILW? Wouldn't the outcome have been the same? I don't think it would be the same, Your Honor. And I certainly don't think that the court can conclude that based on the board's decision. If the board had said, you know, we don't even need to consider employer preference and we would still award the work to the IAM mechanics, then I think that would be a very fair concern. But as this court noted in the local number 50 case, employer preference is usually the most important factor. And if that analysis is wrong, as we're suggesting here, I think at a minimum, the case needs to be remanded for a reassessment of the 10K award. Yes. Do you have any cases that you can cite where the circuit court overturned the board's decision because the board's weighing of the factors weren't supported by substantial evidence? Yes, Your Honor. The Ninth Circuit did that in the local number 50 case, the 1974 decision that I mentioned. And in that case, it both found a lack of substantial evidence for the board's interpretation of the contract. And it held that the board's reasoning was arbitrary and capricious. And it sent the case back for reconsideration. So tell me, just you can help me because you're arguing both that that was not supported by substantial evidence and then arbitrary and capricious. So I'm trying to figure out if the board's decision, if we determine that the board's decision is not supported by substantial evidence, is that sufficient to vacate the board's award? Or do we do another arbitrary and capricious? Because it seems like you're arguing both. And I wanted to see how they come into play here. I think either or, Your Honor. If you found either a lack of substantial evidence, that would be sufficient. If you found arbitrary and capricious reasoning, that would also be sufficient. Does this en banc court actually have the three judge panels reach the merits in the first instance? Your Honor, I don't have a recommendation there. I defer to the court on how to conduct its en banc proceedings. I don't know if it's common for the court to decide part of an issue or part of a case en banc and then send it back for additional proceedings to the original panel. One of the district, one of the panel members was a district judge sitting by designation, so I'm not sure how practical that would be. And of course, this court does have the authority to resolve the entire case, having granted en banc rehearing. And that may be the more efficient approach. But again, I wouldn't presume to tell the court how to conduct its procedures. Unless there are further questions, I'll try to reserve the remaining time for rebuttal. Thank you, Your Honor. May it please the court. My name is Micah Jost for the Labor Board. There are three main points I'd like to make this morning regarding Kinder Morgan. The first is to emphasize that as ILWU has just conceded, there is no other case other than Kinder Morgan that applies secondary boycott work preservation as a defense in a jurisdictional dispute. Second, nothing in the text of the act or the policies of the ILA cases would support doing so. And third, if secondary boycott work preservation had been a defense in the past, many of the cases cited in the briefs would have come out differently. Obviously, Sealand is such a case. Donley's, those are both cases that the board cited in its decision at footnote eight. But also the American Mail Line case and the ILWU local number 50 case that my opponents have been discussing. Those are cases in which there was a comparable agreement, a work preservation agreement, and it was treated as a factor in the 10-K analysis. There can be no 10-K analysis if there is an affirmative defense to Section 8B4D because, as the Supreme Court said in the Texas Tile case, you only get to the award of the work if there is reasonable cause to believe that 8B4D has been violated. So the work preservation question is logically antecedent. That is something that ILWU has repeatedly recognized in the past. In cases like the 2007 Reefer case, this court's decision unpublished in 253 Federal Appendix 625. In that case and in the 2024 Cold Ironing case, which is a board decision at 373 NLRB number 39. In those cases, ILWU had the work and there was a dispute over it with IAM. And ILWU asserted work preservation as a defense in the 10-K in order to not risk that that work would be awarded to another union in order to ensure that it retained its right to fight for it, to coerce for it. I heard a claim that Kinder Morgan is a narrow decision that only applies to automation types of work preservation agreements. That is not what Kinder Morgan says. Kinder Morgan flatly states that work preservation, as it conceives it, is a defense, a complete defense, to 10-K and 8B4D. And the cases it cites there are important. It cites ILA, but it also cites National Woodwork, which was not an automation work preservation case. That dealt with a union saying we will only handle blank doors. Carpenters will only fit the doors themselves at the job site. They won't handle pre-fitted doors from elsewhere. There was no sort of automation claim analogous to what we have here. The two factors from that test are, is it the traditional work of the union and does the employer have the right of control? That is an extremely broad test that establishes primary objectives in a variety of circumstances. And again, Kinder Morgan, the other case it cited was a New York Presbyterian Hospital case, which is a board case dealing with subcontracting. No claim of- Can I take you to the 10-K analysis? Yes, sir. And again, it's been discussed earlier in our conversations where the board here, you know, made a-inferred a preference. Why shouldn't we send it back for a further balancing in the first instance, given that it appears that they made a preference even though the employer specifically affirmatively indicated that they didn't have a preference? I would submit, Your Honor, that the employer didn't say it did not have a preference. The I'm not going to give you a preference. He acknowledged it's important not to irritate either union. He said, we have relationships. We employ hundreds of people under both of these unions. Therefore, I'm asking you-we acknowledge he asked the board to make a decision without regard to preference. But then both sides tried to sort of pry the preference out of him in his testimony. And ultimately, at 73 of our excerpts of record, he said, if we didn't have any contract obligations, that means to either union, we would be going with the people that we know. We'd be going with the people that we have at Terminal 18, Terminal 30. Five minutes away, 10 minutes away, they have people already working for them who already know these cranes. Those cranes are going to be moved over to Terminal 5. These people also did the work for American President Lyons previously. So there's all these considerations that make perfect sense for why he would prefer that. And I think he, without meaning to give away the game, he essentially did. And that's what ILWU, both its legal counsel and one of its representatives, I think, acknowledged in the supplemental excerpts of record that Mr. Rosenfeld submitted, that they, in the arbitration, said SSA turned around and did the wrong thing. And remind me, what case do you have to indicate that where there is this non-preference that the board has inferred one? That's the United Drilling case. And it's not a non-preference. It's a failure to state a preference. And I concede that that case is not precisely on all fours. It's not the exact same employer language. The employer there simply failed to state a preference one way or the other. But the board, when it's presented with its precedent, it has the sign painter's case where an employer affirmatively states, I have no preference. And the Henkel's case that was discussed, I don't know what the exact language was that the employer used. It's not recited in the decision. But the board said that it disclaimed having a preference. So in Henkel's and in sign painters, the employer said, we have no preference. And by contrast, in the United Drilling case, there simply was no affirmative statement one way or another. And the board- An employer not having a preference and an employer declining to express a preference. And I'm just trying to figure out, should that really matter? I think ultimately, the board is trying to ensure that the employer is protected here. Often, an employer will assign work consistent with many of the factors that otherwise support an award under 10K. So here, for example, we have the efficiency, we have the greater skills, we have the past practice. And so in many cases, those things do line up. And so here, I think it's logical for the board to look at that. But didn't, in Henkel's one that was cited, it seems like, you know, just trying to reconcile this line drawing. And there, the employer declined to state preference for either group of employees. And therefore, notwithstanding the fact that the two employer witnesses expressed personal preferences for one group, the NLRB concluded that this disclaimer is controlling. And so employer preference is neutral, and thus not a factor favoring either group. So I'm just trying to figure out why wasn't SSAT's disclaimer here controlling? And why didn't the board determine that this factor is neutral? Here again, I think it's just that the board, when it looked at the testimony from DeNike, that he did not disclaim having a preference as in Henkel's. He said simply, I'm not going to tell you what the preference is. I can't hear you very well. Could you speak up a little bit? I'm sorry, Your Honor. Yes. It's simply, and I acknowledge this is a relatively fine distinction, but the board is saying in a case where the employer representative simply says, I'm not going to give you a preference because I have to maintain good relations with both unions. That's an unusual circumstance. That's what the board had to deal with here. And he did say, if we didn't have our contract obligations, we knew the people who had already been working for us at Terminal 18 and 30. And if we didn't have those contract obligations, we would have used those guys, the IMA guys, that we already had working for us. So there certainly was enough in the record that would state, but for the contractual obligation ILWU, that the employer may have preferred the people that they had been working with and who were already working on those terminals, right? I think that's right. I think ultimately, it's a question of substantial evidence and that is the evidence that we rely on here and that the board relied on. In Henkel's, and tell me, it appears that the employer declined to state a preference like SSAT did here. And even though two employer witnesses expressed a preference for one union in Henkel's, the board still determined that the factor was neutral. Is that your understanding? That is what the decision says, Your Honor. Yeah. And why isn't that controlling? Well, because here again, I think the hearing this from the executive in charge of SSA, I think because he didn't officially explicitly disclaim having a preference, he simply said, I won't tell you what it is. But then he essentially let it out. I think that is what the board relied on here. But again, there are ample other factors that support finding that preference. There's the efficiency consideration. There's the greater skill, the lower cost, the fact that these people have been doing the work there in the past and it was SSA's practice with regard to the Seattle port. If the court disagrees and concludes that there's not substantial evidence, then I think this would have to be a remand for the board to reconsider the Section 10K award. But if the court does that, I want to emphasize that it is still important for the court to resolve the Kinder Morgan question because work preservation once again is an antecedent issue. I'm not making a claim about preclusion. I'm not arguing about can or cannot raise it. I'm simply saying logically, you don't get to awarding the work unless there is reasonable cause to believe AB4D is violated. So if this case were sent back for a reevaluation of the 10K, the first question the board would have to address as it always does in these cases is whether there is in fact a dispute that qualifies for it to resolve under the statute. Let me ask you, you just said something because I'm trying to figure out what the procedure is here. If this court does determine that the decision was not supported by substantial evidence, you said something we would send it back for the board to make a new determination? If the court concludes that there is not substantial evidence to support the board's award of the work based on any aspect of its decision, then yes, I think it would be more. I suppose that the parties would probably make their arguments about whether that new award should be made based on the fact that they are now or the fact that they were in 2018. I don't have a position on that. I can't tell you. Let me ask you because setting aside the new facts and representation in SSAT's proposed amicus brief that I understand that the board wishes to strike, the brief does indicate that it now supports ILWU. I guess I just want to try to find out given the board's role in promoting industrial peace, what does the board make of SSAT's support of ILWU and the position on remand? I don't believe that affects the remand because that's not an argument that was properly presented to the board. This court lacks jurisdiction to consider it. As far as what I make of their representation, I would say I think they should have raised that years ago to the board. For them, I don't think it promotes industrial peace. I don't think it promotes stability for an employer to be able to take one position at the hearing and then years later after the unions have made their cases or I'm not alleging any sort of unlawful coercion by anyone but letting the unions sort of continue to press in the ensuing years and then have the employer change its mind and then telling the board that it has to go back to square one. That doesn't resolve the dispute as SSA suggests. It simply restarts it. It sends us all the way back. Separate from whether we should consider facts that are outside the administrative record, I actually thought that that amicus brief actually supported the board's decision because it says ILWU hired the five machinists from IAM who are doing the work. So the preference of SSAT is because one union has basically poached the machinists who were doing the work at IAM. And that's why now the employers changed its mind. And the fact that ILWU had to poach those five machinists from IAM tells me that they actually didn't have the machinists on hand when this dispute arose, that they had to get them from IAM. So I don't think it's appropriate to consider new facts, but when I look at that, to me it actually confirms that probably the board was correct. IAM had the machinists who had been working at that terminal, who did the work, whom the employer knew, and that's why ILU had to hire them. I certainly don't disagree with any of that. Of course, as board counsel, I can only argue the facts on the record and the findings of the board. But what I would note about the board's findings is that in the 10k, it discusses the fact that the employer had to, or the record at least, shows that the employer had to bring mechanics up from Southern California initially in order to do the work for ILWU, whereas for IAM, once again, it had the people already working at terminal 18, at terminal 30, and it was able to put them to work at much lower cost and greater efficiency. I want to touch on one other practical point about what the board's order does and what it doesn't do, just to make sure that everyone is completely clear about this. The board's order does not require, SSA in its brief notes, that it's not required to assign the work to either union under the board's order, and that is correct. The board's order doesn't run to SSA. It doesn't say you have to assign to this union or that union. What the board's order does is to bar ILWU from using coercion to get the work. It gives SSA a safe harbor if it awards the work to IAM. It means that if it gives the work to ILWU, IAM can coerce to get it. If it gives the work to IAM, ILWU cannot coerce to get it. I want to contrast that with what happens under Kinder Morgan. If this was declared to be a work preservation dispute, that does not mean that ILWU gets the work. Simply, it means that the board is ousted of any role in resolving the dispute. It means that the board goes back and quashes the notice of Section 10K award hearing. That's what it did in Kinder Morgan on remand, and this court's recon refractory decision has a footnote that recites other cases in which the board has done that. That simply leaves SSA without any safe harbor. It means no matter who it gives the work to, both unions have the right to continue to coerce it. I don't think that's relevant, Your Honor. The parties, I believe, have renegotiated their contract since then, but in evaluating the board's decision, the court is looking at the fact that at the time... Since we issued Kinder Morgan in 2020, has the board noticed more jurisdictional disputes or more of those disputes that aren't being resolved because of our decision? I can't speak to any sort of statistical analysis, and the board has had a great deal of upheaval and backlog in recent times, and so I'm not sure how this would play out. I would note, again, in the cold ironing case from 2024, that's the case at the same terminal, very analogous facts, and in that case, ILWU did try to raise work preservation, did try to argue that it was a work preservation dispute because that came after Kinder Morgan. In the 10K in this case, which predated Kinder Morgan, ILWU, on the same essential facts, did not argue work preservation, and I think it's because they recognized that it was not available to them because this was new work and neither union had done it before. It had not been culpably reassigned in a way that would make this a work preservation under Safeway, and so I think that is why they didn't try to argue it in the 10K here. They did try to argue it in the 10K in the cold ironing case, and the board rejected it, replying... Going back to the 10K, the ILWU in its presentation this morning made arguments about how, in their view, the board didn't adequately consider some of the differences between the two contracts. Can you address that? I'm not sure what you're referring to. The collective bargaining agreements and the automation... Yeah, yeah. No, I think that's fair, Your Honor. They're talking about the Alvin Steve Vador and American Mail Line cases. Those cases, as I said, are central to our argument against Kinder Morgan because they demonstrate that the agreement is a factor in the 10K analysis, not something that takes it outside of 10K. But in those cases, the facts were simply fundamentally different. Those cases are about quarrels between the operating engineers and ILWU, or in the later Alvin cases, operating engineers versus seafarers. The operating engineers predominantly did their work in construction sites. As the industry in the 50s and 60s moved towards the use of large cranes on the waterfront instead of older manual methods of transferring cargo, during that time, operating engineers would have started doing some work along the waterfront, but it was still just a small part of their work. In those cases, in discussing the contract, the CBA, that ILWU had, and in applying the same principles in support of the seafarers union, they look at that. They look at what is the overall industry trend. The trend is toward longshore people doing this work, and it's away from operating engineers. Operating engineers have their work elsewhere. ILWU, seafarers, they are the ones who are taking over this work here. That is a different set of considerations from the ones that the board has here with regard to IAM, which has done this work since, I think the record suggests, 1940s or 1960s at the latest, doing the same maintenance and repair work on the waterfront for SSA. The overall considerations simply balance differently. In that regard, I want to emphasize that in the 10K, if you look at the post-hearing brief that we submitted from ILWU, we submitted as a supplemental excerpt of record here. At page 17 of our supplemental excerpt of record, ILWU argued that the contracts were neutral here. They argued both sides have CBAs that cover this work. Therefore, there's not anything on the scale either way as far as these contracts. At this point, they're saying the board didn't give enough weight to the contract. It should weigh it differently, but they didn't ask the board to do that. That's not a basis for attacking the board's decision here. It can be considered in future cases going forward. Nothing prevents them from arguing it. Nothing prevents them from arguing that the specific facts of any given case are more comparable to Alvin Stevedore or American Mail Line. I want to make one more small point about the American Mail Line case. In footnote 10 of that decision, the board refers to separate 8B4B proceeding, a secondary boycott proceeding, involving the same facts. In that case, it had found that there was a permissible primary purpose that did not prevent it from awarding the work under Section 10K. That's what we asked the court to do here. Unless there are any further questions, we simply ask for enforcement of the board's order in full. Thank you. Thank you. David Rosenfeld for the IM. I think I'm the only lawyer who's been in every one of these proceedings, and it's been a long time, almost a decade now. When we showed up to do the 10K, we had Henkels in mind because we knew that Ed DeKnight was going to say exactly what he said. I've got two unions. I deal with them all up and down the coast. I've dealt with them for years. I'm not stating a preference and ask the board to decide. As Mr. Jones pointed out, the question is whether I, as counsel for the IM, or Eleanor Morton, counsel for the OWU, or the board hearing officer, would pry out of Ed DeKnight a preference. I use the word cross-examine. As Judge Coase pointed out, there's lots of testimony in the record, enough to make it clear that he did prefer the IM. My favorite quote was when he had said, I would prefer to use the folks I know already, meaning the IM members who work just next door at Terminal 18 and 30, rather than hire new people he didn't know. That was Ed DeKnight. He preferred to protect his current employees and give them work rather than hire new employees. There were other things that Ed DeKnight said that made it clear that he did prefer the IM. And in Henkels, there's a fact that I think is important. Remember, it was Henkels, the owner of the company, who said, I will disclaim a preference. And then there were a couple of lower-level officials who testified that they thought they'd prefer the other union. And the board said, well, that was just their personal preference. But here we have a very different aspect. We have Ed DeKnight, who ran this company for years, negotiated with both unions, and had respect from all these unions, getting on the stand and saying, I'm being cross-examined and going much further. So in Henkels, there was no cross-examination of Mr. Henkels to pry out of him facts or a preference. And Ed DeKnight, I think, made it clear in many of his statements that he did prefer the IM. And when the 10K decision issued a couple months later after some peace on the waterfront we worked out, he then put IM members back, meaning he moved them from 18 next door to five, and they worked there until after the panel decision issued. And then the ILWU said, well, the decision is vacated, and pressured SSA to then take our members, take them off the terminal, and replace them with ILWU members who are currently working there today. And there are charges pending before Region 19 over this that are outside the record, but the dispute has not ended. So I think that in reading Henkels, it actually supports what the board did, because it says if Henkels, or in this case, Ed DeKnight, express other, make other statements that suggest that he really did want the IM, then I think that is substantial evidence, in fact, in my view, more than substantial evidence in this case. And I will say that when we started this case, we all kind of knew that was the critical issue here. So the ILWU lawyer put on evidence about economy and efficiency. We did the same thing. The hearing lasted two or three days, but the critical part was when Ed DeKnight was sitting there and was examined. And I still remember that cross-examination, because I think it opened up in large degree what the board did in this case. Because as the ILWU has pointed out, and the PM has pointed out, I think it's clear that in virtually every 10-K case, the board awards the work to the employer who expresses a preference for a union. That's to protect employers. So I haven't done many 10-K cases in my career, because when a client comes to me and says, they stole my work, those other workers are doing that other union, what can I do? And I say, well, what's the employer's choice? Who do they prefer? Well, they use the other union. They've got a contract with them. I said, 10-K, I'm going to help you. But because we knew Ed DeKnight was going to be not disclaiming that he had a preference, I want to be clear. He never said he had no preference. He simply said, to maintain peace among these unions up and down the coast, I'm not going to give a preference. So I think that answers a preference case. I'm a little surprised that the ILWU would say that we don't have any preservation language in our contract. And she keeps using the word automation. And Mr. Keneally used the word technology. But when you read the IAM language in our contract, which was in evidence, the employer agrees that any future work created by advancements in technology or changes in existing technology necessary to perform all M&R work will continue to be performed by employees covered by this agreement, being IAM members, but not limited to technology and automation. We have as a broader work preservation clause for automation and technology as ILWU does. So, sir, can I ask you, I read the contract the same way. It seems to me that that provision or very similar provision appears in both contracts. So then what is the legal import of that? How does that factor into our analysis? What it factors into is that the in every decision, it analyzes the contracts. And what it does, it says, does the contract cover the work in dispute? And indisputably, because we all stipulated, the ILWU contract covered the work, the IAM contract covered the work. So once the board makes that determination, that factor becomes neutral if both contracts cover it. It washes it out. It washes it out. And the cold ironing case, again, I lived through four days of hearing over that, or what is a minute of my work. Cold ironing, just because it's a phrase, means now when ships come into port, they have to turn off their engines to eliminate pollution. It's been going on for 15, 20 years. So the iron becomes cold. It's not hot anymore. And that's what cold ironing is. So the issue is, who plugs the ship in to shore power? It takes an hour and a half to do it, to plug it in, an hour to unplug it. And that's what that dispute was about. But in that case, Ed DeKnight said, he looked at both contracts. And the IAM contract didn't specifically refer to cold ironing. But the ILWU contract did. So the board gave more weight to the ILWU contract because it specifically referred to cold ironing, while our contract just referred to all M&R. And I took the position that included cold ironing, but I lost that. So when you look at the fact that the board says, we weigh that in favor of the ILWU and not the IAM because it's more specific. The board had all that in front of it. And I think that that answers the question about that. And I will say that counsel said twice that these kind of agreements are rare. That's not my experience. I don't think there's a contract out there that doesn't have some language in it to protect the union's jurisdiction from changes in work process, automation, mechanization. Mr. Jost mentioned the Woodward case and said that wasn't an automation case. Well, I disagree to some degree because what the Woodward case was, was a change in work process. Doors being fitted off the job site rather than on the job site. And today, construction unions are fighting about pre-modular housing. Units that are built totally off the job site, a crane comes, lifts them up, puts them in place, the hook them up, and they're done. Now, you may not call that automation, but every union has language that protects it from changes in work process, automation, mechanization, now artificial intelligence. We had it. The IWU's got it. That becomes largely neutral in these disputes. And we look to the other factors such as economy and efficiency. And again, Mr. Jost mentioned this, and this was to me really the important fact that you had Terminal 5 where one ship would dock about twice a week. So, it made sense that when the ship docked, you could bring crane operators from Terminal 18 next door, have them there when the ship was there, operate the crane, and go back to 18, which was a very busy terminal. And then you could bring some ion mechanics to work in the CEM shop. That's where they maintain the containers. And if they had a lot of containers at 5, they worked there, or they could move back to 18 and 30. So, the economy and efficiency was so obvious that it seemed to me an overwhelming factor. But anyway, going back, so the two issues that I really want to address was the issue of preference, because I think that's the record is so strong. Ted's questions, I think, are really on point about that being clear in the record and a proper finding supported by substantial evidence. And the same thing is true of this IWU argument that I want to address for a few minutes, which is they're sort of conceding that Kinder Morgan is wrong, except they say it has to apply in the maritime industry for longshore. So, they're trying to cabin that and say there's something special because of automation. And there's some truth to their special in the sense that they are the victims of the ILA, not the victims, the victims of containerization. It's happened to them, but that's happened to every union. I can think of some unions, the typographical union, that's gone because of technology. But the point about this whole thing is that this technology thing is affecting every union, and every union negotiates language and contracts to protect it. It may not be as broad as this. I mean, I remember just meat cutters have language in the contract about bringing in prepackaged meat. It's technology, automation, change in work process. So, it's by no means rare, which is why the board, in answer to your when it looks at a contract, says both contracts cover the work in dispute, that factor is neutral, and then we look to economy and efficiency. And there's a practical reason why they do that, and that is because every union tries to negotiate as broad as jurisdiction language as it can to encompass as much work, but sometimes it gets away with it. But just to kind of give you a sense of what we're talking about here, we've had a contract for a long time. In the Puget Sound, they've had an agreement with District 160 for now 50, almost 60 years. They've had a contract with another IAM Lodge in California. So, we have sort of a coast-wide arrangement where we represent 300 or 400 mechanics up and down the coast at various terminals. We've had a great relationship with SSA, and LWU also represents a lot of mechanics up and down the coast. They didn't represent mechanics until roughly the end of the, until being around 2000 when this company PCMC developed, and they've grown and grown with mechanics, and we've lived peacefully together. We work together. We have these disputes, and they get resolved through the 10k process. So, I'll just conclude. Did you want to conclude? Yes, I just want to conclude by saying that we've almost gone on 10 years now. We'd like to get this resolved. We asked the court enforce the board order in full, which simply tells the LWU you can't pressure, you can't coerce SSA in its decision as to who to award the M&R work at Terminal 5. Thank you. Thank you. You both ran out of time. I'm going to give you each one minute. Thank you, Your Honors. Briefly, I want to note that Kinder really is a narrow decision. I'd ask the court to look at page 630 of that decision, which sets out the issues that the court is resolving, and it really is narrowed in on automation work preservation agreements. I think it's important to note that the board is asking an awful lot of the court here with respect to Kinder Morgan. It's asking you to draw a bright line with respect to the work preservation doctrine that's not found either in the underlying decision or in the decision or indeed in any of the board's decisions. We don't think the court needs to go nearly so far because of the board's errors at the 10K, which should lead to the vacature of both orders under review here. Finally, I want to note that IAM's agreement is not an automation work preservation agreement, both because it's not narrowly tailored to preserve work and because it doesn't concern the direct quid pro quo of automation with which the ILA cases were concerned. The rules that were under consideration there, like the PCLCD, were a quid pro quo over automation, and that's meaningful, and IAM's contract doesn't have that. Thank you. Thank you. Thank you, Your Honor. Real quickly, I agree wholeheartedly with Mr. Joseph's point that a work preservation agreement should be a factor in the 10K analysis, but I disagree with his arguments that the ILWU didn't ask the board to give it that kind of weight. The NLRB's supplemental excerpts of record, pages 22 to 24, are making the same argument and citing the same cases, the Alvin Stevedore case, the Howard Terminal case that we've highlighted for this court as well, where the board gave the same contract significant weight in its 10K decision, and it should have done that here. With respect, I don't think that Mr. DeNike's testimony about a counterfactual, what would happen if there were no contracts at all, could be substantial evidence. It's conjecture and speculation, and if you want to know what his weighing of all of the considerations, all things considered, led him to do, well, we know because given two contracts, he assigned the work to the ILWU. Thank you, Your Honors. Thank you. Mr. Foley, Mr. Kennelly, Mr. Stolzis, and Mr. Rosenfeld, thank you all very much for your argument presentations here today. The case of International Longshore and Warehouse Unit and International Longshore Warehouse Unit Local 19 versus the NLRB and International Association of Machinists and Aerospace Workers, District 160, Local Lodge 289, is now submitted, and we are adjourned. Thank you. This court's discussion is now adjourned. Thank you.
judges: MURGUIA, GOULD, SMITH, CHRISTEN, BADE, LEE, BRESS, VANDYKE, KOH, THOMAS, MENDOZA